[Crim. No. 5925. Third Dist. June 8, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
ARTHUR JAMES HARRIS, Defendant and Appellant.

2

## COUNSEL

Don F. Vieira, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch and Evelle J. Younger, Attorneys General, Roger E. Venturi and Gary Allon Larson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BRAY, J.**\*—Defendant appeals from a judgment, after jury verdict, convicting him of second degree robbery.

### QUESTIONS PRESENTED

1. The lineup was not unnecessarily suggestive.

2. No immaterial or irrelevant evidence was introduced.

3. The court's ruling as to examination of defendant if he took the stand was proper.

### RECORD

Defendant was charged with violation of Penal Code section 211 (robbery). At the trial a hearing was had outside the presence of the jury and defendant's motion to have the identification evidence excluded because he claimed the lineup was unfair was denied. It was stipulated that defendant had waived his right to have an attorney present at the lineup. The jury found defendant guilty of second degree robbery and sentenced him to state prison for the term prescribed by law.

### FACTS

On March 25, 1970, about 9:45 p.m., three black men walked into the Handy Pantry store in Sacramento. Working in the store were Rodney Ramsey, the owner's son, age 14, and Randy Pimm. One of the men was wearing a white scarf on his head, a jacket and bright yellow pants. He told Rodney that it was a holdup. Rodney later identified defendant as the man who did all the talking. Pursuant to directions from defendant Rodney put

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

the contents of the cash register in a bag and turned over to defendant a bundle of money orders from a drawer. Rodney and Randy were ordered into a back room and told to lie on the floor for five minutes. When they reached the front of the store, the robbers were gone. Rodney gave a description of defendant to a passing policeman.

The day after the robbery Rodney was shown photographs of possible suspects. He picked out one as showing a man who looked like the robber. It was not a picture of defendant.

Two days after the robbery William Smart was at a home where defendant and Janice Wright were present. Defendant asked Smart to give them a ride to the store so Janice could cash a check. Failing to cash it at Safeway, Smart took defendant and the girl to the Handy Pantry market. A clerk there testified that on that day a black female attempted to cash a Handy Pantry money order made out to Stella Wilson. (That girl was Janice Wright.) She said her name was Stella Wilson and used a medical identification card with that name on it. The store manager decided there was something wrong with the money order and refused to cash it. When Janice left the store, the manager checked the license number of the car in which she was riding. It was a Chevrolet and had two males and Janice in it. He called the police. Later at a different location Officer Davis spotted the car from the description given over the air. Occupying the car were Janice, defendant and William Smart, all of whom were taken into custody. Defendant had to be forcibly restrained after he struck one of the police officers. Defendant was then wearing a yellow jacket and some bright yellow pants. A medical identification card made out to Stella Wilson was found in Janice Wright's coat pocket.

Stella Wilson testified that the identification card found on Janice Wright was Stella's medical card. She thought until she came to court that she had it with her. She mentioned that the day she visited defendant's sister both Janice and defendant were there.

At the trial Rodney positively identified defendant as the robber.

Defendant did not testify.

### The Lineup

Defendant's main contention that the lineup was unfair is based upon the fact that he was the only one in it wearing bright yellow pants. The color photographs of the lineup were before the court and jury. Defendant wore a long coat that covered the upper portion of the pants. There were three other black men standing with defendant, two of whom bore a resemblance

to him. The man standing next to defendant wore tan or gold pants. The mere fact that defendant was wearing the same color pants worn by the robber did not make the lineup unfair. At the scene of the robbery defendant was not wearing any type of mask, and the victim in a well-lighted store had ample opportunity to observe defendant's features during the 5 to 10 minutes the robbery lasted. Rodney immediately thereafter described defendant to the police as being a tall Negro, about 21, relatively slim, wearing a white scarf over his head, some kind of jacket and bright yellow pants. When asked what he noticed about defendant when he was in the lineup that was distinctive, Rodney answered, "His looks" and then "he was wearing the same yellow pants." Before the lineup the victim was not told that the police had arrested a suspect. At the lineup, which took place two days after the robbery when the victim's memory was fresh, Rodney immediately identified defendant, and his identification was based solely on defendant's facial characteristics even though he noticed that defendant was wearing the same type of yellow pants he had seen on the robber. Rodney testified that he would have been able to identify defendant had he met him on the street. The fact that Rodney picked out the photograph of another person as a man who looked like defendant did not detract from his later identification of defendant. This photograph was introduced at the trial and the jury had an opportunity to decide if there was any resemblance. The record supports Rodney's testimony that his in-court identification of defendant was based upon his observation of defendant at the scene during the course of the commission of the crime and because of defendant's facial characteristics and not upon the lineup identification, although there was nothing wrong with the latter identification. Rodney's remembrance of the yellow pants served only to reinforce the credibility of his description of defendant. ■ Whether a lineup is unnecessarily suggestive depends upon "the totality of the circumstances." (*People* v. *Harris* (1969) 274 Cal. App.2d 826, 832 [79 Cal.Rptr. 352].) This lineup was not unnecessarily suggestive or conducive to mistaken identification.

Applicable here is the following from *People* v. *Brown* (1969) 273 Cal. App.2d 109, 112 [77 Cal.Rptr. 863]: "The overriding consideration here is that the record establishes without any doubt that . . . [the victim's] in-court identification of defendant was based solely on a source independent of any pretrial identification either by photograph or lineup. [Citations.]"

### WAIVER OF COUNSEL AND COMPETENCY

■ Before the lineup defendant signed a waiver of counsel in which he expressly acknowledged that he had been advised of his right to counsel and that an attorney would be appointed for him if desired. Defendant con-

tends that he did not knowingly and intelligently waive his right to counsel at the lineup, and, in any event, the court made no express determination of his competency in that respect.

Out of the presence of the jury a hearing was held on defendant's motion to exclude the identification evidence because he claimed that the lineup procedure was unfair. The police officer who took the waiver was examined by both counsel and stated that the waiver was voluntary and that defendant indicated that he understood the officer's advice to him concerning his right to an attorney. His counsel stipulated that defendant had waived his right to counsel at the lineup. No question was raised at the trial level that he did not knowingly or intelligently waive that right. It is too late to raise such questions.

■ ". . . Where a party stipulates to the lack of an issue, he cannot raise that issue on appeal." (*People* v. *Davis* (1969) 270 Cal.App.2d 841, 843 [76 Cal.Rptr. 242].) ■ Moreover, it is well established that the issue of absence of counsel at lineup cannot be raised for the first time on appeal. (*People* v. *Williams* (1970) 2 Cal.3d 894, 909 [88 Cal.Rptr. 208, 471 P.2d 1008]; *People* v. *Morrow* (1969) 276 Cal.App.2d 700, 703 [81 Cal.Rptr. 201]; *People* v. *Davis, supra,* p. 843.)

## MATERIAL EVIDENCE

■ Defendant contends that the evidence relating to the attempt of Janice Wright to cash a Handy Pantry money order made out to Stella Wilson is irrelevant and immaterial and its probative value was outweighed by its prejudicial effect, and hence the court erred in not striking it from the record. The contention is obviously without merit. Evidence Code section 210 states that relevant evidence is evidence "having a tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." This evidence was relevant to the issue of whether or not defendant committed the robbery. ■ It meets the test set forth in *People* v. *Schader* (1969) 71 Cal.2d 761, 775 [80 Cal.Rptr. 1, 457 P.2d 841]: "Before permitting the jury to hear evidence of other offenses the court must ascertain that the evidence (a) 'tends logically, naturally and by reasonable inference' to prove the issue upon which it is offered; (b) is offered upon an issue which will ultimately prove to be material to the People's case; and (c) is not merely cumulative with respect to other evidence which the People may use to prove the same issue."

■ Defendant stole Handy Pantry money orders. Two days later defendant, Stella Wilson and Janice Wright were together in the same house. Shortly thereafter, at the request of defendant and Janice, Smart drove the

two to a store so Janice could "cash a check." She attempted to cash a Handy Pantry money order made out to Stella Wilson, using for identification Stella's medical identification card, which Stella did not give to Janice. Defendant waited outside the store while Janice, giving her name as Stella Wilson, was trying to cash the money order.

Although a Handy Pantry money order was introduced in evidence (apparently to show the type of money order stolen) it was not identified as one of those stolen, nor was it the one Janice tried to cash. A reasonable and logical inference naturally follows that since defendant was with Janice when Stella's identification card mysteriously disappeared and since he accompanied Janice to the store (although he remained outside) he and Janice were in league in attempting to negotiate one of the money orders which he stole.

### THE COURT'S RULING CONCERNING DEFENDANT TESTIFYING

■ Defendant contends that, in effect, he was prevented from taking the stand by the trial court's ruling that if he did so he could be questioned about his relationship to Janice's attempt to cash the money order. The judge said: "If a man gets on the stand, says he denies committing the robbery, I believe that he can be asked any question relative to the commission of that robbery, one of which is that he has so attempted to pass a forged instrument two days later that was connected with that robbery." The court correctly stated the law.

"Under federal decisions a defendant who takes the stand and testifies in his own behalf waives his Fifth Amendment privilege against self-incrimination at least to the extent of the scope of relevant cross-examination. [Citations.] It matters not that the defendant's answer on cross-examination might tend to establish his guilt of a collateral offense for which he could still be prosecuted. [Citations.]" (*People* v. *Ing* (1967) 65 Cal.2d 603, 610 [55 Cal.Rptr. 902, 422 P.2d 590].)

Under the judge's ruling defendant would still have had the right to refuse to answer any irrelevant questions.

Judgment affirmed.

Pierce, P. J., and Regan, J., concurred.